# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:08CR00018 |
| v. ) | **OPINION AND ORDER** |
| ) | |
| ELIZABETH COCILOVA, a/k/a ) | By: James P. Jones |
| ELIZABETH HALE, AND JUSTIN ) | Chief United States District Judge |
| EDWARD HALE, ) | |
| Defendants. ) | |

*Zachary T. Lee, Assistant United States Attorney, Abingdon, Virginia, for United States of America; Nancy C. Dickenson, Assistant Federal Public Defender, Abingdon, Virginia, for Elizabeth Cocilova, a/k/a Elizabeth Hale; and Donald A. McGlothlin, Jr., The McGlothlin Firm, Lebanon, Virginia, and Helen E. Phillips, Grundy, Virginia, for Justin Edward Hale.*

The defendants, convicted by a jury of drug crimes and bank fraud, move for judgment of acquittal or for a new trial. For the reasons that follow, I will set aside the verdicts of guilty as to bank fraud on the ground that the government failed to prove that an insured bank was a victim of the defendants' fraudulent scheme. Otherwise, I will deny the motions. In addition, I will exclude from the sentencing guidelines calculations of one of the defendants, her statements as to drug quantity given in a proffer session, but I will allow it in her codefendant's case.

I. BACKGROUND.

The defendants were convicted by a jury in this court of conspiracy to distribute a controlled substance (Count One), 21 U.S.C.A. § 846 (West 1999), possession with intent to distribute or distribution of a controlled substance, 21 U.S.C.A. § 841(a)(1) (West 1999), obtaining controlled substances by fraud (Counts Three, Four, and Five), 21 U.S.C.A. § 843(a)(3) (West 1999), attempt to obtain controlled substances by fraud (Counts Six, Seven, and Eight), 21 U.S.C.A. § 846, conspiracy to commit bank fraud (Count Ten), 18 U.S.C.A § 1349 (West Supp. 2008), and bank fraud (Count Eleven), 18 U.S.C.A. § 1344 (West 2000). Both defendants filed timely post-verdict motions seeking judgments of acquittal, Fed. R. Crim. P. 29(c), and a new trial, Fed. R. Crim. P. 33. The motions have been briefed and argued. This opinion sets forth the court's rulings on the motions, and on an issue arising in connection with the sentencing of the defendants.

The defendants, Elizabeth Cocilova and Justin Hale, are husband and wife. They were both employed with Appalachian Cast Products ("ACP"), a small manufacturing business located in Abingdon, Virginia. Elizabeth is the daughter of one of the owners and officers of the company, Richard Cocilova. During the time period in question, Elizabeth was the office manager and had the authority to sign checks for the company. She also was in charge of reconciling the bank statements

and keeping the company's books on a day-to-day basis. Justin, her husband, was a supervisor in the shipping department.

Both Elizabeth and Justin were illicit drug users and the government contends that to support their drug habits, Elizabeth embezzled from the company by writing unauthorized checks to herself and Justin, which she attempted to cover up by doctoring the records. The evidence at trial showed that $137,941.51 in checks had been electronically deleted from the company's books. The checks in question were drawn on Sun Trust Bank, a federally insured institution, and were either cashed or deposited into the accounts of Elizabeth and Justin.

The government also charged that Elizabeth and Justin produced fraudulent drug prescriptions, which they had filled at local pharmacies, and that they sold or otherwise distributed illicit drugs to other employees at ACP. In November of 2007, they were caught by police after a high-speed chase, following their unsuccessful attempt to pass a fraudulent prescription at a Rite-Aid Pharmacy in Abingdon.

Elizabeth later gave statements to police admitting that she had committed prescription fraud five or six times and that she had stolen "a lot of money from [ACP] to some where near 140,000. . . . to support my drug habit and later to support my family." (Gov't's Ex. 5.) She also admitted selling drugs that she had purchased with the proceeds from the embezzlement. Justin gave a statement to police in which

- 3 -

Case 1:08-cr-00018-JPJ   Document 138   Filed 11/05/08   Page 3 of 18   Pageid#: 597

he admitted having been involved in passing forged prescriptions in Elizabeth's name and the name of Justin's father. Neither defendant testified at trial.

In their motions, the defendants argue that the evidence at trial was insufficient to convict them of certain of the charges. In considering the sufficiency of the evidence on a post-verdict motion, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The court is not permitted to "overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another, reasonable verdict would be preferable." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

On the other hand, "although the United States may rely on inferences and circumstantial evidence, it 'nevertheless must establish proof of each element' of the crime." *United States v. Ismail*, 97 F.3d 50, 55 (4th Cir. 1996) (quoting *Burgos*, 94 F.3d at 858). As stated in *Burgos*, "[t]o require less of the Government would eviscerate its burden to prove all elements of a crime beyond a reasonable doubt and relieve it of its burden of vigilance in prosecuting crimes—thereby violating bedrock principles of our Anglo-American jurisprudence." 94 F.3d at 858.

## II. PROOF OF CONTROLLED SUBSTANCES.

Both defendants maintain that the government offered insufficient evidence for the jury to find beyond a reasonable doubt that the drugs involved were controlled substances. They cite the lack of scientific or chemical analysis of any drug discussed during this case, though they acknowledge that is not required. They also contend that the circumstantial evidence offered by the government on this issue bears no resemblance to the examples provided in *United States v. Dolan*, 544 F.2d 1219, 1221 (4th Cir. 1976), examples they deem "highly instructive" to the issue at hand.

The government may establish the identity of a substance involved in a drug transaction through lay testimony and circumstantial evidence. *Id.* Scientific testimony is unnecessary, since "no court has held that scientific identification of a substance is an absolute prerequisite to conviction for a drug-related offense." *United States v. Uwaeme*, 975 F.2d 1016, 1020 (4th Cir. 1992) (internal quotation marks and citations omitted). Circumstantial evidence of a controlled substance may include:

> [E]vidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence . . . .

*Dolan*, 544 F.2d at 1221.  Although extensive, this list does not impose on the government "a rigid proof requirement for all charges of narcotics possession." *United States v. Abuelhawa*, 523 F.3d 415, 423 (4th Cir. 2008).  It must not be read as a "checklist or formula for sufficiency."  *Id.*  Rather, so long as "the circumstantial evidence is adequate, the question of whether the substance is within the statutory prohibition is for the jury."  *United States v. Tinsley*, 800 F.2d 448, 450 (4th Cir. 1986).

Applying this standard, the Fourth Circuit has affirmed drug-related convictions where the government presented minimal evidence of a controlled substance.  For instance, in *United States v. Bautista*, Nos. 91-5593, -5594, -5601, -5613, 1992 WL 172667, at *6 (4th Cir. July 22, 1992) (unpublished), evidence on this issue included the testimony of drug users and drug dealers who testified that one of the defendants distributed cocaine.  Similarly, in *United States v. Arnold*, No. 93-5417, 1995 WL 318768, at *2 (4th Cir. May 26, 1995) (unpublished), evidence deemed sufficient consisted of testimony from police officers who found crack in the defendant's apartment and testimony from a witness who bought crack from the defendant.  In *United States v. Scott*, 725 F.2d 43, 46 (4th Cir. 1984), the price paid for a product, the conduct of the defendant during a drug sale, the manner in which the actors treated the product, and the testimony of a drug abuser about the effect of

the product permitted the jury to infer that the product was in fact a controlled substance. Less convincing but nonetheless adequate was the evidence offered in *Tinsley*. There, the government relied solely on witnesses who had experience in buying and using methamphetamine. *See Tinsley*, 800 F.2d at 450 ("They were familiar with its appearance and the economics of supplying, buying, and selling it.").

I find that the evidence of controlled substances in this case is at least tantamount to the proof offered in *Bautista*, *Arnold*, *Scott*, and *Tinsley*.

The defendants' family physician, Dr. Handy, testified at trial. He prescribed both defendants pain medication, but eventually dismissed them from his practice. He released Justin Hale because he learned that he had copied pain medication prescriptions and distributed them to other people. Elizabeth Cocilova was released because a drug test revealed that she had taken an unauthorized narcotic, morphine. Dr. Handy also testified as to the nature of the drugs he prescribed his patients. He labeled Oxycodone, Adderall, Percocet, Vicodin, and Endocet as Schedule II controlled substances and Lortab as a Schedule III controlled substance.

Several of the defendants' fellow employees testified about illicit activities they had observed in the workplace. For instance, witness Widener testified that she had seen Elizabeth snort a substance through a straw on her desk. She also stated that at

one time Justine had pink and yellow pills with him. The pills were in a little plastic bag, not a pill bottle.

Witness Poore stated that she had seen Elizabeth leave a bathroom with white powder around her nose. Justin asked her to serve as a lookout for supervisors, but she refused despite Justin's suggestion that "she could party with them." (Tr. 82-83.) At the request of Elizabeth, she delivered an "odd" manilla envelope to the company mailbox that she thought contained money. (Tr. 83.)

Witness Harless testified that when he worked at ACP he and Justin had "switched drugs back and forth." (Tr. 88.) They exchanged Lortab and OxyContin, drugs that Harless had abused in the past. Harless testified that he knew Justin had prescriptions for some of the pills, but not others. Another admitted drug addict, witness Neely, testified that she had received Lortab from Justin and occasionally paid him money in return. Neely and Elizabeth abused pills together; they took OxyContin, Lortab, and Percocet. At times, Neely would pay Elizabeth or clean her house in exchange for OxyContin.

Witness Romans explained that the defendants used a code system at ACP to facilitate their drug trade. Either Justin or Elizabeth would announce over the intercom that the other had a package, a signal that a shipment of pills they ordered

- 8 -

over the Internet had arrived. Romans also stated that Justin had given him painkillers, including Percocet, Lortab, and occasionally, OxyContin.

Witness Peake testified that both defendants had given her Lortab while at ACP, both had abused pain medication, and both had told her that they were distributing pills. She also observed "pill transfers" at ACP. (Tr. 144.) In addition, Elizabeth told Peake that she had purchased approximately 120 pills from a man named Jerry.

Justin did landscaping work for witness Ridenbaugh, who was also charged with drug dealing. Ridenbaugh testified that Justin admitted distributing pain pills at the place where ie worked and told Ridenbaugh that he paid his landscaping employees with pills. In fact, empty pill capsules were found at Ridenbaugh's home after Justin and his crew completed work there. Ridenbaugh also testified that Justin had given him scales to weigh drugs. Justin told Ridenbaugh that he tried to hide the pills he intended to distribute from his wife because she had a drug problem.

Witness South testified that she and the defendants had attempted to pass fraudulent prescriptions at a pharmacy. Elizabeth was trying to obtain Lortab, Percocet, Adderall, and Vicodin with the fraudulent prescriptions. South received Lortab from Elizabeth and knew that Justin abused Lortab and Adderall.

- 9 -

Case 1:08-cr-00018-JPJ   Document 138   Filed 11/05/08   Page 9 of 18   Pageid#: 603

This evidence is comparable if not more convincing than the type of evidence held sufficient in *Bautista*, *Arnold*, *Scott*, and *Tinsley*. The defendants distributed drugs that Dr. Handy explicitly labeled controlled substances. ACP employees and others testified about the defendants' distribution activities; these witnesses were self-described addicts who could distinguish between different types of pills. Drug abuse at ACP was widespread and the defendants even developed a code to signal the delivery of pills. They gave drugs to persons addicted to pain medication in exchange for services and sometimes money.

For these reasons, I find that a jury could rationally concluded beyond a reasonable doubt that the drugs the defendants distributed were controlled substances.

### III. PROOF OF BANK FRAUD.

The defendants contend that the government's evidence was insufficient to prove that they violated the federal bank fraud statute by virtue of the embezzlement scheme.

The federal bank fraud statute provides that

> [w]hoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; or

> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C.A. § 1344.

Count Ten of the Indictment charged the defendants with conspiracy to commit bank fraud, and alleged, as an overt act, that Elizabeth Hale "forged the signatures of company officers on checks of her employer without their authority in order to obtain funds to which she was not entitled." (Count Ten(A).) Count Eleven charged the defendants, as principals or as aiders and abetters, with the substantive crime of bank fraud and similarly alleged that as part of the scheme Elizabeth had forged the signatures of company officers.

The jury in this case was instructed without objection that a necessary element of bank fraud required an intent to defraud the bank and that the false or fraudulent pretenses made were material, meaning that they "were capable of influencing the decision of Sun Trust [Bank]." (Tr. 120.)

While there is a difference of interpretation of the bank fraud statute among the circuits, *see* Joseph Callister, Comment, *The Federal Bank Fraud Statute: A Plain*

*Interpretation*, U. Chi. Legal F. 495, 495 (2005), the Fourth Circuit has held that under § 1344, the insured bank must be an intended victim of the fraud, even if it is not the immediate victim and even if it was only exposed to a potential loss. *United States v. Brandon*, 298 F.3d 307, 311-12 (4th Cir. 2002). In *Brandon*, the defendant presented a forged check to a retail merchant, the check being drawn on an insured bank. On appeal, the defendant argued that the merchant, and not the bank, was the victim of the fraud. However, because the drawee bank was presented with a forged check, it was exposed to a potential risk of loss, and thus the crime was within the statute. *Id.* at 312; *see United States v. Thomas*, 315 F.3d 190, 200 (3d Cir. 2002) ("Cashing facially valid checks, even where the bank is deceived as to their legitimacy, does not expose the bank to liability and, therefore, there is no bank fraud.").[1]

Recognizing the force of *Brandon*, the government argues that the jury could have inferred from the evidence that Elizabeth forged the signatures of company officials, as charged in the Indictment.

---

[1] The technical rule as to the bank's liability is found in section 3-307(b)(3) of the Uniform Commercial Code: "If an instrument is issued by the represented person or the fiduciary as such, and made payable to the fiduciary personally, the taker does not have notice of the breach of fiduciary duty unless the taker knows of the breach of fiduciary duty." Va. Code Ann. § 8.3A-307(b)(3) (2001); *see* Henry J. Bailey & Richard B. Hagedorn, *Bailey on Bank Checks: The Law of Bank Checks* ¶ 13.08 (2007).

At trial there was no direct evidence that Elizabeth had forged any signatures. Of the 209 checks payable to Justin or Elizabeth that were introduced into evidence as both (1) having been deleted from the company books and (2) not being their "legitimate payroll" (Tr. 41), all but 42 were signed by Elizabeth.[2] These 42 checks had signatures appearing to be that of owners Richard Cocilova, Michael Feracci, or Stephen Canonico, with some of the checks having multiple signatures. Neither Richard Cocilova nor Stephen Canonico testified at trial. Feracci, the CEO of the company, did testify. He stated that Elizabeth had the authority to sign checks by herself when the officers of the corporation were "out of the plant" (Tr. 63), but that the officers wrote the checks when they were in the plant. He was not asked if his signatures on the checks in question were legitimate.

Nothing about the signatures of the other officers of the company indicates that they are forgeries. That is, they look to be in a different handwriting than Elizabeth's; some are in different-colored ink. Perhaps they are forgeries, but it is equally likely

---

[2] These checks were introduced as Government Exhibit No. 3 and a schedule of the checks was introduced as Government Exhibit No. 2. The government also introduced a number of the other checks payable to Elizabeth or Justin, or Elizabeth Widener, another employee, which the accountant and part owner of the company, Patrick Hickie, "thought were lacking in business reason" but which had not been erased from the company records. These checks were similarly signed by Elizabeth, Richard Cocilova, Feracci, and/or Canonico. However, Hickie testified that he had "not gone through and specifically identified as far as these [checks] being authorized." (Tr. 48.)

that Elizabeth, as office manager and keeper of the books, merely fooled various officers into signing checks that she had prepared.[3] In that case, the signatures would be genuine and the bank authorized to pay them, even though they were obtained by Elizabeth's fraud. That fraud, however, was committed against the company, and not the federally insured bank.

In short, I agree with the government that the evidence was entirely sufficient for the jury to find that Elizabeth defrauded her employer by way of all of the 209 checks in question, whether signed by her or not. The problem with the government's case, however, is that there was no evidence by which a reasonable jury could find beyond a reasonable doubt that the bank was a potential victim of the fraud. For this reason, I will grant the defendants' Motions for Judgment of Acquittal as to Counts Ten and Eleven.

## IV. PROOF OF DRUG CONSPIRACY.

Defendant Hale asserts that there was insufficient evidence to connect him with his wife's drug activities, other than passing the three fraudulent prescriptions which

---

[3] As it turned out, Elizabeth apparently admitted in a pre-prosecution proffer session with the government that she <u>did</u> forge some of the signatures, but the government did not attempt to introduce that statement into evidence at trial. The proffer agreement between the defendant and the government is further discussed hereafter.

- 14 -

he confessed to during his police interrogation, as charged in Counts Three, Seven, and Eight.

A defendant may be convicted of conspiracy despite having played only a minor role. Once it has been shown that a conspiracy exists, "the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992). Moreover, as the jury was instructed, a conspirator may be convicted of a substantive offense committed by a co-conspirator in the course of and in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 645 (1946).

After carefully reviewing the evidence, I find that there was adequate evidence for the jury to find Justin Hale guilty of the drug offenses charged in the case.

## V. MOTIONS FOR NEW TRIALS.

Alternatively, the defendants move for new trials, also based on the insufficiency of the evidence. A new trial on this ground is to be granted only "sparingly" in the "rare circumstance when the evidence weighs heavily" against the jury's verdict. *United States v. Singh*, 518 F.3d 236, 249 (4th Cir. 2008) (internal quotation omitted). While the evidence in this case would have supported verdicts

for the defendants, I cannot say that it falls into the narrow class of cases where I am permitted to disregard the result and grant a new trial before a different jury.

VI. USE OF PROFFER STATEMENT.

Prior to her indictment, Elizabeth Cocilova and the government entered into a written proffer agreement, dated August 17, 2007. The agreement provided as follows:

> I have indicated that I wish to provide certain information to law enforcement personnel concerning my knowledge of criminal activity. I agree that anything I say to federal or state law enforcement personnel, pursuant to this agreement, may be used for any purpose, including but not limited to, use in any state or federal criminal prosecution with the following exception:
>
>> The United States agrees that it will not introduce in a criminal prosecution of me, in its case-in-chief at trial, any of the statements I make pursuant to this agreement.
>
> However, if I give false statements to the agents or if I commit perjury the exception set forth above does not apply and all statements I make may be used for any purpose. Also, the exception set forth above does not apply to statements concerning crimes of violence and such statements may be used for any purpose. This agreement applies to statements I make at an interview conducted on Friday, August 17, 2007, at the United States Attorney's Office in Abingdon, Virginia. Statements I make at other times are not governed by this agreement and may be used for any purpose.

(Def.'s Mem. Opposing Use of Proffer Statement at Sentencing, Ex. A.)  Following that agreement, Elizabeth answered questions by an FBI agent concerning her drug activities and the embezzlement from her employer.

Both defendants have now objected to the use in determining their sentencing guideline range of any information obtained from Elizabeth's proffer session.  They base their objection on § 1B1.8 of the guidelines:

> Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

U.S. Sentencing Guidelines Manual § 1B1.8(a) (2007).

While the government contends that the language of the proffer agreement permits the use of Elizabeth's statements to calculate her guideline range, I disagree. I find that the proper interpretation of § 1B1.8 requires that any such agreement specifically refer to the court's ability to consider the defendant's statement in such calculation.  *See United States v. Shorteeth*, 887 F.2d 253, 257 (10th Cir. 1989). Because the present agreement does not, the court is unable to use Elizabeth's statements concerning drug quantity in arriving at her advisory guideline range.

- 17 -

As to defendant Hale, however, I find that § 1B1.8 does not insulate him from his codefendant's statements. Indeed, a central purpose of proffer statements is to obtain information concerning other individuals suspected of engaging in criminal activity.

For these reasons, I will grant defendant Cocilova's motion but deny defendant Hale's similar request.

## VII. CONCLUSION.

For the reasons stated, it is **ORDERED** as follows:

1. Defendants' Motions for Judgment of Acquittal and for a New Trial are GRANTED in part and DENIED in part;

2. Judgments of acquittal are entered in favor of the defendants as to Counts Ten and Eleven of the Indictment;

3. The said motions are otherwise denied;

4. Defendant Cocilova's Motion Opposing the Use of Proffer Statement at Sentencing is GRANTED; and

5. Defendant Hale's Motion Opposing the Use of Proffer Statement at Sentencing is DENIED.

ENTER: November 5, 2008

/s/ JAMES P. JONES
Chief United States District Judge